<u>NOT FOR PUBLICATION</u>

## <u>UNITED STATES DISTRICT COURT</u>
## <u>FOR THE DISTRICT OF NEW JERSEY</u>

```
_____
                               :
RAFAEL FONTANEZ,               :
                               :        Civil Action No.
              Plaintiff,       :        11-2573 (RMB)
                               :
         v.                    :        O P I N I O N
                               :
ABIGAIL LOPEZ et al.,          :
                               :
              Defendants.      :
_____:
```

<u>Bumb</u>, District Judge:

      Plaintiff Rafael Fontanez ("Plaintiff"), an inmate confined at
the Federal Correctional Institution at Forth Dix, Fort Dix, New
Jersey, seeks to bring this action <u>in forma pauperis</u>, alleging
violations of his constitutional rights, pursuant to <u>Bivens v. Six
Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388
(1971), and also asserting wrongdoings subject to the reach of the
Federal Tort Claim Act ("FTCA"). Based on his affidavit of
indigence and the absence of three qualifying dismissals within 28
U.S.C. § 1915(g), the Court will grant Plaintiff's application to
proceed <u>in forma pauperis</u>, pursuant to 28 U.S.C. § 1915(a), and
order the Clerk to file the Complaint.

      At this time, the Court must review the Complaint to determine
whether it should be dismissed as frivolous or malicious, for

failure to state a claim upon which relief may be granted, or because it seeks monetary relief from a defendant who is immune from such relief.

I.   **BACKGROUND**

    A.   **Facts Suggested by Plaintiff's Exhibit**

Here, Plaintiff asserts that he duly exhausted his FTCA tort claims before the Department of Justice ("DOJ"), see Docket Entry No. 1, at 15, although his voluminous (62-page-long) compilation of exhibits exhibit no tort claim filed by Plaintiff with the DOJ, no response by the DOJ, no tort claim or administrative grievances filed by Plaintiff with the Bureau of Prisons ("BOP"), and no response by the BOP's Regional or Central Offices. The only document pertinent to his administrative exhaustion efforts, which this Court could glean from the submissions in the record, is a response Plaintiff received from his current warden as to his administrative grievance.[1]   See Docket Entry No. 1-2, at 62.

---

[1]   For the purposes of Bivens and habeas actions, the BOP Administrative Remedy Program is a three-tier process that is available to inmates confined in institutions operated by the BOP for "review of an issue which relates to any aspect of their confinement."  28 C.F.R. § 542.10.  An inmate must initially attempt to informally resolve the issue with institutional staff. 28 C.F.R. § 542.13(a).  If informal resolution fails or is waived, an inmate may submit a BP-9 Request to "the institution staff member designated to receive such Requests (ordinarily a correctional counsel)" within 20 days of the date on which the basis for the Request occurred, or within any extension permitted.  28 C.F.R. § 542.14.  An inmate who is dissatisfied with the Warden's response to his BP-9 Request may submit a BP-10 Appeal to the Regional Director of the BOP within 20 days of the date the Warden signed the response.  See 28 C.F.R. § 542.15(a).

That response, in pertinent part, reads as follows:

This is in response to your Request for Administrative Remedy in which you state you have been denied the mandatory community medical standards of care for your broken right arm.  You make no specific request for relief.

A review of your medical records reveals on July 12, 2009, you were evaluated by medical staff for an injury to your right forearm from being hit by a softball.  You were given Motrin for the pain and instructed to apply ice and elevate your arm.  You were instructed to return to Health Services in the morning if symptoms did not improve.   On  July  15,  2009,  you  returned  to  Health Services requesting to be re—evaluated for the injury. An  x-ray  was  taken  revealing  a  non—displaced  distal fracture  of  the  ulna.   A  full  cast  was  applied.   On August  11,  2009,  another  x-ray  was  taken  revealing  the same non—displaced distal fracture.  On August 20, 2009, you reported to Health Services without your cast.  You stated you removed the cast a few days earlier because it itched and you were able to move you fingers without pain.  An x-ray was taken revealing a non-healing mildly displaced fracture, therefore, a splint was applied.  On August  27,  2009,  you  were  evaluated  by  the  Orthopedic Surgeon who diagnosed you with a healing fracture of the right  ulna  with  malunion.   He  recommended  corrective surgery,  which  was  performed  on  October  15,  2009.   You were  placed  in  a  splint  and  instructed  to  keep  it  in place  until  further  evaluation.   On  October  29,  2009, you  were  evaluated  by  the  Orthopedic  Surgeon.   He ordered x-rays and another follow-up examination in four weeks.  On November 19, 2009, the Orthopedic Surgeon's

---

The inmate may appeal to the BOP's General Counsel on a BP-11 form within 30 days of the day the Regional Director signed the response.  See id.  Appeal to the General Counsel is the final administrative appeal.  See id.  If responses are not received by the inmate within the time allotted for reply, "the inmate may consider the absence of a response to be a denial at that level." 28 C.F.R. § 542.18.  Notably, the Bureau of Prisons has also set forth the administrative procedure for tort claims falling within the realm of the FTCA, see 28 C.F.R. §§ 543.30-543.32, but — since Plaintiff expressly asserted that his FTCA claims were exhausted before the DOJ, rather than the BOP — Sections 543.30-543.32 seem to have no relevance to the case at bar.

examination revealed the incision was well-healed with
the x-ray revealing early callus.  You were instructed
to remain in the splint and to continue with range of
motion exercises.  On January 28, 2010, the Orthopedic
Surgeon reviewed new x-rays which showed good healing.
The physical exam revealed full pronation and decreased
supination.  You were instructed to discontinue using
the splint, perform home exercises to improve
supination, and avoid push-ups and resistance exercises
with your right wrist.  This response is for
informational purposes only.

Id.

B.    **Facts Asserted in the Complaint**

Plaintiff's Complaint, see Docket Entry No. 1, does not allege

that the statement of facts provided in the above-quoted warden's

response was erroneous, see, generally, id.; however, Plaintiff

asserts his own chain of events (which, in part, corresponds with

those asserted in the warden's letter, and – in part – provides

additional facts, omits certain facts referred-to by the warden,

and introduces Plaintiff's own perceptions of all facts).[2]  See id.

at 4-11.  Specifically, Plaintiff states that:

1.    Allegedly, on July 12, 2009, Plaintiff was examined by

        Defendant Bourton ("Bourton"),[3] during which examination he

        showed Bourton his swollen arm, and Bourton: (a) spent 10

_____

[2] For the purposes of the Court's instant review, this Court
*presumes* all Plaintiff's facts and perceptions to be true.
However, such presumption shall not be construed as the Court's
*factual finding* that Plaintiff's allegations are actually true.

[3] While Plaintiff's Complaint makes allegations against
Bourton as if Bourton was named as a Defendant in this action,
the caption of Plaintiff's Complaint does not list him as a
Defendant.  See Docket Entry No. 1, at 1.

minutes examining Plaintiff's arm; (b) found that an x-ray of Plaintiff's arm was not yet necessary; and (c) prescribed Plaintiff Motrin.   See id. at 4-6.   On the basis of these facts, Plaintiff concludes that Bourton violated his rights by not spending longer time examining Plaintiff's arm and by not conducting an immediate x-ray.   See id. at 5-6.

2.   Allegedly, Plaintiff returned to Fort Dix medical services on July 15[4] and was examined by Defendant Elias ("Elias"), during which examination Elias: (a) conducted an x-ray of Plaintiff's arm; (b) concluded that a bone within Plaintiff's arm was fractured; (c) scheduled Plaintiff's examination by an orthopedic surgeon for July 31, 2009; and, apparently (d) placed a cast on Plaintiff's arm.   See id. at 6-9.   Defendant Lopez ("Lopez"), being Elias' supervisor, allegedly concurred with Elias' decision that Plaintiff's arm should be examined by an orthopedic surgeon and, allegedly, approved of the date of such scheduled examination.   See id.   On the basis of these

---

[4] The Complaint does not explain why Plaintiff waited until July 15, 2009, rather than returning to the medical services next day, that is, on July 13, 2009, as he, seemingly, was advised by Bourton.   However, and importantly here, no statement made in the Complaint indicates that either Bourton or Elias (or any other person named as a Defendant) prevented Plaintiff from returning to the medical services on July 13, 2009, or otherwise obstructed Plaintiff's access to medical help.   The Court, thus, presumes, for the purposes of this Opinion only, that this 48-hour delay from July 13 to July 15 was Plaintiff's choice, perhaps driven by his hopes that the joint effect of Motrin, ice and keeping Plaintiff's arm up, would improve his condition in a few days.

facts, Plaintiff concludes that Elias and Lopez violated his rights by not having Plaintiff examined by an orthopedic surgeon immediately, and that Elias violated Plaintiff's rights by placing a cast on his arm (since Plaintiff, seemingly, believes that the cast, somehow, exacerbated Plaintiff's injury). See id.

3.   Plaintiff's arm was examined by an orthopedic surgeon on August 27, 2010.[5] See id. at 8-9. Allegedly, from July 15, 2009, to October 15, 2009, Plaintiff met with Elias on numerous occasions requesting pain-reducing medication, but his requests were denied by Elias. See id. at 10. On the basis of this fact, Plaintiff concludes that Elias violated his rights by not giving Plaintiff any form of pain relief. See id.

From these allegations, Plaintiff deduces that Bourton, Elias and Lopez violated his constitutional rights by being deliberately indifferent to Plaintiff's medical needs (for the purposes of his Bivens challenges) and committed wrongs subject to the reach of the FTCA. See id. at 8-16. Plaintiff also asserts that the current and prior wardens of Fort Dix are liable to him under the respondeat superior theory. See id. at 15-17 (making these allegations, seemingly, with the main goal to allege that these

---

[5] However, Plaintiff asserts that the orthopedic surgeon compiled a report about Plaintiff's arm on July 29, 2009, that is, thirty days prior. See Docket Entry No. 1, at 9.

wardens are liable to Plaintiff under the FTCA, although without naming these wardens as Defendants in this matter in the caption of the Complaint and without listing these wardens as Defendants in the "Introduction" section of the Complaint, that named Lopez, Bourton and Elias as Defendants).

The Complaint closes with Plaintiff's request for relief seeking unspecified damages under the FTCA and damages for the alleged constitutional violations.  See id. at 17.

## II.  **STANDARD OF REVIEW**

In determining the sufficiency of a complaint, the Court must be mindful to construe the facts stated in the complaint liberally in favor of the plaintiff.  See Erickson v. Pardus, 551 U.S. 89 (2007); Haines v. Kerner, 404 U.S. 519 (1972); United States v. Day, 969 F.2d 39, 42 (3d Cir. 1992).  Indeed, it is long established that a court should "accept as true all of the [factual] allegations in the  complaint and reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff."  Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997).  However, while a court will accept well-pled allegations as true, it will not accept bald assertions, unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations.  See id.

Addressing the clarifications as to the litigant's pleading

requirement stated in the United States Supreme Court in <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544 (2007), the Court of Appeals for the Third Circuit provided the courts in this Circuit with detailed and careful guidance as to what kind of allegations qualify as pleadings sufficient to pass muster under the Rule 8 standard.   <u>See</u> <u>Phillips v. County of Allegheny</u>, 515 F.3d 224, 230-34 (3d Cir. 2008).   Specifically, the Court of Appeals observed as follows:

> "While a complaint . . . does not need detailed factual allegations, a plaintiff's obligation [is] to provide the 'grounds' of his 'entitle[ment] to relief' [by stating] more than labels and conclusions, and a formulaic recitation of the elements of a cause of action . . . ." <u>Twombly</u>, 127 S. Ct. at 1964-65 . . . Rule 8 "requires a 'showing,' rather than a blanket assertion, of entitlement to relief." <u>Id.</u> at 1965 n.3. . . . "[T]he threshold requirement of Rule 8(a)(2) [is] that the 'plain statement [must] possess enough heft to 'sho[w] that the pleader is entitled to relief.'" <u>Id.</u> at 1966. [Hence] "factual allegations must be enough to raise a right to relief above the speculative level." <u>Id.</u> at 1965 & n.3. . . . [Indeed, it is not] sufficient to allege mere elements of a cause of action; instead "a complaint must allege facts suggestive of the proscribed conduct." <u>Id.</u>

<u>Id.</u> at 230-34 (original brackets removed).

This pleading standard was further refined by the United States Supreme Court in its recent decision <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937 (2009):

> [In any civil action, t]he pleading standard . . . demands more than an unadorned ["]the-defendant-unlawfully-harmed-me["] accusation. [<u>Twombly</u>, 550 U.S.] at 555 . . . . A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." [<u>Id.</u>] at

555.  Nor does a complaint suffice if it tenders
"naked assertion[s]" devoid of "further factual
enhancement." Id. at 557. . . . A claim has facial
plausibility [only] when the plaintiff pleads factual
content . . . . Id. at 556. [Moreover,] the
plausibility standard . . . asks for more than a sheer
possibility that a defendant has acted unlawfully.
Id. [Indeed, even w]here a complaint pleads facts that
are "merely consistent with" a defendant's liability,
[the so-alleging complaint still] "stops short of
[showing] plausibility of 'entitlement to relief.'"
Id. at 557 (brackets omitted). [A fortiori,] the tenet
that a court must accept as true all of the
allegations contained in a complaint is inapplicable
to legal conclusions [or to t]hreadbare recitals of
the elements of a cause of action, supported by mere
conclusory statements [,i.e., by] legal conclusion[s]
couched as a factual allegation [e.g.,] the
plaintiffs' assertion of an unlawful agreement [or]
that [defendants] adopted a policy "'because of,' not
merely 'in spite of,' its adverse effects upon an
identifiable group." . . . . [W]e do not reject these
bald allegations on the ground that they are
unrealistic or nonsensical. . . . It is the
conclusory nature of [these] allegations, rather than
their extravagantly fanciful nature, that disentitles
them to the presumption of truth. . . . [Finally,] the
question [of sufficiency of] pleadings does not turn .
. . . the discovery process. Twombly, 550 U.S.] at 559
. . . . [The plaintiff] is not entitled to discovery
[where the complaint alleges any of the elements]
"generally," [i.e., as] a conclusory allegation
[since] Rule 8 does not [allow] pleading the bare
elements of [the] cause of action [and] affix[ing] the
label "general allegation" [in hope to develop facts
through discovery].

Iqbal, 129 S. Ct. at 1949-54.

## III. *BIVENS* CHALLENGES

### A.   *Respondeat Superior* Claims

Although it appears that Plaintiff's Complaint seeks to assert

respondeat superior liability against the wardens mainly for the

purposes of Plaintiff's FTCA challenges, the Court finds it

warranted to address these <u>respondeat</u> <u>superior</u> claims, if such were intended, for the purposes of Plaintiff's <u>Bivens</u> challenges, since the Court still has to address the issue in light of Plaintiff's reference to Lopez, whose involvement is asserted on the basis of: (a) her capacity as Elias' supervisor; and (b) her alleged agreement with Elias' conclusion that Plaintiff should be examined by an orthopedic surgeon and that scheduling such examination for July 31, 2009, was sufficient.

Absent consent by a state, the Eleventh Amendment bars federal court suits for money damages against state officers in their official capacities, <u>see</u> <u>Kentucky v. Graham</u>, 473 U.S. 159, 169 (1985), and – in addition – supervising officials cannot be held liable for actions of their subordinates unless the litigant asserts facts showing these supervisors' personal involvement in the alleged wrongs.  <u>See</u> <u>Iqbal</u>, 129 S. Ct. 1937; <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978); <u>Rizzo v. Goode</u>, 423 U.S. 362 (1976); <u>Durmer v. O'Carroll</u>, 991 F.2d 64, 69 n.14 (3d Cir. 1993).  With the same token, claims against the supervisors are subject to dismissal to the degree they are based solely on the <u>respondeat</u> <u>superior</u> theory.  <u>See</u> <u>Natale v. Camden County Corr. Facility</u>, 318 F.3d 575, 584 (3d Cir. 2003) (because <u>respondeat superior</u> or vicarious liability cannot be a basis for liability under 42 U.S.C. § 1983, a corporation – even if it is operation under contract with the state – cannot be held liable for the acts

of its employees and agents under those theories).

Therefore, if Plaintiff intended to assert <u>respondeat</u> <u>superior</u> claims against his current and prior wardens, or against Lopez, for the purposes of Plaintiff's <u>Bivens</u> challenges, these claims are subject to dismissal, with prejudice, for failure to state a claim upon which relief can be granted.

**B.   <u>Eighth Amendment Claims</u>**

For the purposes of Plaintiff's <u>Bivens</u> challenges, the foregoing analysis leaves the Court only with Plaintiff's Eighth Amendment claims against Bourton and Elias, and Eighth Amendment claims against Lopez based on her alleged agreement with Elias' conclusion that Plaintiff had to be seen by an orthopedic surgeon and that July 31, 2009, was an acceptable date for such examination.

Plaintiff has a protected right in being incarcerated at a place of confinement confirming to the standards set forth by the Eighth Amendment.   The Constitution "does not mandate comfortable prisons," <u>Rhodes v. Chapman</u>, 452 U.S. 337, 349 (1981), but neither does it permit inhumane ones, and it is now settled that "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." <u>Helling v. McKinney</u>, 509 U.S. 25, 31 (1993).   In its prohibition of "cruel and unusual punishments, the Eighth Amendment . . . imposes duties on [prison] officials, who must provide humane

conditions of confinement; prison officials . . . must take reasonable measures to guarantee the safety of the inmates." Hudson v. Palmer, 468 U.S. 517, 526-527 (1984), see Helling, 509 U.S. at 31-32; Washington v. Harper, 494 U.S. 210, 225 (1990); Estelle v. Gamble, 429 U.S. 97, 103 (1976).

The Eighth Amendment prohibits conditions which involve the unnecessary and wanton infliction of pain or are grossly disproportionate to the severity of the crime warranting imprisonment. Rhodes, 452 U.S. at 346, 347. The cruel and unusual punishment standard is not static, but is measured by "the evolving standards of decency that mark the progress of a maturing society." Rhodes, 452 U.S. at 346 (quoting Trop v. Dulles, 356 U.S. 86, 101 (1958)).

The Eighth Amendment proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. See Estelle v. Gamble, 429 U.S. 97, 103-04 (1976). In order to set forth a cognizable claim for a violation of his right to adequate medical care, an inmate must allege: (1) a serious medical need; and (2) behavior on the part of prison officials that constitutes deliberate indifference to that need. See id. at 106. To satisfy the first prong of the Estelle inquiry, the inmate must demonstrate that his medical needs are serious. "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to

medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" Hudson v. McMillian, 503 U.S. 1, 9 (1992).  Serious medical needs include those that have been diagnosed by a physician as requiring treatment or that are so obvious that a lay person would recognize the necessity for doctor's attention, and those conditions which, if untreated, would result in lifelong handicap or permanent loss.  See Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir.1987), cert. denied, 486 U.S. 1006 (1988).  The seriousness of an inmate's medical need may also be determined by reference to the effect of denying the particular treatment.  See id. at 347. For example, pursuant to Estelle, if "unnecessary and wanton infliction of pain" results as a consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the Eighth Amendment.  See Estelle, 429 U.S. at 105.  In addition, where denial or delay causes an inmate to suffer a life-long handicap or permanent loss, the medical need is considered serious.  See, e.g., Archer v. Dutcher, 733 F.2d 14, 16 (pregnant inmate who miscarried stated cognizable claim where she alleged that defendants intentionally delayed emergency medical aid for months in order to make her suffer). Hence, a medical need is serious where it "has been diagnosed by a physician as requiring treatment or is . . . so obvious that a lay person would easily recognize the necessity for a doctor's

attention." Monmouth County Correctional Institution Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987), cert. denied, 486 U.S. 1006 (1988).

"Deliberate indifference" exists "where [a] prison official: (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." Rouse, 182 F.3d at 197. Furthermore, deliberately delaying necessary medical diagnosis for *a long period of time* in order to avoid providing care constitutes deliberate indifference that is actionable. See Durmer v. O'Carroll, 991 F.2d 64 (3d Cir. 1993). Deliberate indifference is also evident where officials erect arbitrary and burdensome procedures that result in *interminable* delays that deny medical care to suffering inmates. See Monmouth County Correctional Institution Inmates v. Lanzaro, 834 F.2d 326, 346-47 (3d Cir. 1987), cert. denied 486 U.S. 1006 (1998). However, inconsistencies or differences in medical diagnoses, relatively short delays unaccompanied by arbitrary or unduly burdensome bureaucratic procedures, refusal to consider inmate's self-diagnoses, to summon the medical specialist of the inmate's choice, or to perform tests or procedures that the inmate desires, to explain to the inmate the reason for medical action or inaction, or to train the inmate to perform medical procedures cannot amount to

cruel and unusual punishment. <u>See</u> <u>White v. Napoleon</u>, 897 F.2d 103 (3d Cir. 1990) (mere disagreements over medical judgment or treatment do not state Eighth Amendment claims); <u>Alsina-Ortiz v. Laboy</u>, 400 F.3d 77 (1st Cir. 2005)(a doctor's failure to respond to certain request for services by the inmate, in context of the doctor's continued and regular services, did not deprive the inmate of any meaningful treatment); <u>Smith v. Sator</u>, 102 Fed. Appx. 907 (6th Cir. 2004) (where a prisoner alleged that defendants did not provide various specialized medical tests that the prisoner found to be necessary based on his reading of medical literature, the court held that the complaint was frivolous because refusal to provide specialized tests amounted to nothing more than a difference of opinion regarding the medical diagnosis and treatment and did not rise to the level of an Eighth Amendment violation); <u>Lopez v. Kruegar</u>, 1990 U.S. Dist. LEXIS 6808 (E.D. Pa. June 4, 1990) (where plaintiff stated that he was receiving medication but felt that additional medical tests should be taken, his allegations were directed at the wisdom or quality of treatment and did not state a claim); <u>Coleman v. Crisp</u>, 444 F. Supp. 31 (W.D. Okla. 1977) (difference of opinion between plaintiff and doctors concerning availability of treatment and medication did not establish violation of constitutional right or sustain claim).

Here, Plaintiff asserts that he was examined by Bourton on July 12, 2009, but was not provided with an x-ray; rather he was

provided with pain-killing medication and a directive to return next morning to the medical services if his condition does not improve.  Plaintiff, however, elected to return two days later, that is, on July 15, 2009, when he was examined by Elias, had his arm x-rayed and was diagnosed with a bone fracture.  Nonetheless, Plaintiff asserts that Bourton's decision not to x-ray Plaintiff's arm immediately, i.e., on July 12, 2009, and the fact that Bourton spent ten minutes examining Plaintiff (rather than conducting a longer examination, which Plaintiff, apparently, desired) violated Plaintiff's rights within the meaning of Bivens.

However, failure to provide a desired test (here, an x-ray) or the inmate's displeasure with the shortness of a medical visit cannot indicate deliberate indifference.  Here, Plaintiff's allegations indicate that Bourton was neither deliberately indifferent nor created undue delays to diagnosing Plaintiff; rather, Bourton was presented with a swollen arm, prescribed pain-reducing medication and recommended Plaintiff to return next day if the condition did not improve.  Since Plaintiff's arm was x-rayed and the fracture was diagnosed by Elias right upon Plaintiff's return to the medical services, the "delay" created by Bourton lasted, at most, from the end of Plaintiff's visit to the medical services on July 12, 2009, to the next morning, i.e., the time when Plaintiff was invited to return for a follow-up visit;

consequently, the "delay" was less than 24 hours.[6]

The fact that Plaintiff elected to return to the medical services not on July 13, 2009, but 48 hours later, that is, on July 15, 2009, was a delay of Plaintiff's own making. Therefore, Plaintiff's claim against Bourton based on the alleged "delay" cannot amount to a claim of constitutional magnitude. The same applies to Bourton's decision not to x-ray Plaintiff's arm immediately: even if – with a stretch of imagination – Bourton's decision may qualify as medical malpractice within the meaning of state tort law, it cannot support a constitutional claim.

Analogously, the bulk of Plaintiff's <u>Bivens</u> challenges based on Elias' treatment falls short of stating a claim of constitutional magnitude. Here, Plaintiff asserts that Elias should not have placed a cast of Plaintiff's arm, as a temporary measure guarding Plaintiff's injured. Such dispute over the propriety of selected medical treatment, moreover a temporary medical measure applied with an apparent goal to limit the injury while a consultation by a specialist is awaited, falls outside of the claims of constitutional magnitude. Elias' decision to schedule an examination of Plaintiff's arm by an orthopedic surgeon

_____

[6] According to the response Plaintiff received from his warden, Plaintiff's medical record indicates that Bourton directed Plaintiff to keep his arm up and apply ice, while taking Motrin to ease up the pain; these directives suggest that Bourton entertained the possibility of Plaintiff merely badly bruising – rather than fracturing – Plaintiff's arm as a result of an accident that occurred while Plaintiff was playing softball.

on July 31, 2009, cannot be described as a wrong impinging on Plaintiff's constitutional rights: (a) Plaintiff's injury was an internal bone fracture, which did not cause Plaintiff any danger of infection, external bleeding, etc.; (b) Plaintiff was in a prison environment, where immediate consultation by a medical specialist is unavailable unless the inmate is transported to a hospital; (c) Plaintiff's arm was provided with a temporary protective treatment, i.e., the cast; and (d) Plaintiff was scheduled to be seen by an orthopedic surgeon in just two weeks, such scheduling of Plaintiff's examination by the surgeon could not amount to an act of deliberate indifference.    Indeed, no statement made in the Complaint suggests that Elias sought to unduly delay such examination or that Elias created any undue bureaucratic obstacles to prevent Plaintiff from being seen by the surgeon sooner.   All what Plaintiff's Complaint suggests is that Plaintiff was unhappy with having to wait for his orthopedic surgeon appointment until July 31, 2009; however, such disappointment cannot transform Plaintiff's challenges into a claim of constitutional magnitude.[7]

Analogously, Lopez's decision to support Elias' finding that Plaintiff had to be examined by an orthopedic surgeon cannot

_____

[7] The Complaint is silent as to the reasons why Plaintiff was seen by the orthopedic surgeon not on July 31, 2009, as scheduled by Elias and Lopez, but on August 27, 2009, that is, three and a half weeks later.  Therefore, this Court cannot reach this issue, leaving it to Plaintiff to amend his Complaint by stating Plaintiff's challenges, if any, that might be based on that particular postponement.

qualify as a wrong.  While Plaintiff strives to present Lopez's action as a wrong because Lopez, allegedly, seconded Elias' conclusion that such examination could be scheduled for July 31, 2009, this two-week wait cannot transform Lopez's alleged support for Elias' decision into an act of deliberate indifference.

Therefore, Plaintiff's <u>Bivens</u> challenges based on allegation of: (a) Bourton's failure to immediately x-ray Plaintiff's arm; (b) Borton's examination of Plaintiff's arm that lasted ten minutes; (c) Elias' placement of a cast on Plaintiff's arm; (d) Elias' scheduling of Plaintiff for an orthopedic surgeon examination in two weeks from the date when Elias first treated Plaintiff; and (e) Lopez' seconding of Elias' scheduling decision, cannot amount to claims of constitutional magnitude.  Consequently, these challenges will be dismissed with prejudice for failure to state a claim upon which relief can be granted.

However, taking notice of Plaintiff's <u>pro se</u> status and not ruling out the possibility that Plaintiff might be able to assert facts against Lopez, Elias and Bourton additional to those stated in the Complaint and indicative of these Defendants' constitutional wrongs, the Court will dismiss all Plaintiff's <u>Bivens</u> claims against these Defendants without prejudice.  Therefore, Plaintiff will be allowed an opportunity to file an amended complaint stating such facts.  The Court, however, stresses that such leave shall not be construed as an invitation to relitigate the determinations

reached in this Opinion; rather, Plaintiff has to assert facts *other* than those discussed <u>supra</u>.

### C.  <u>Potentially Viable Claim and Administrative Exhaustion</u>

For the purposes of Plaintiff's Eighth Amendment <u>Bivens</u> challenges, the sole potentially viable claim that this Court can discern from the face of the Complaint is that Elias was allegedly made aware of Plaintiff's severe physical pain but declined to prescribe him any pain-reducing medications during the period from July 15, 2009, to October 15, 2009. Consequently, in the event Plaintiff elects not to amend his Complaint by asserting factual challenges other than those stated in the Complaint at bar, but elects to proceed with his challenge based on such alleged denial of pain-reducing medications, Plaintiff can simply verify, in writing, his desire to so proceed.

However, in light of Plaintiff's assertion that he exhausted only his personal tort claims with the DOJ (and Plaintiff's replication of solely his warden's response to his administrative grievance), this Court finds it warranted to point out to Plaintiff that all his <u>Bivens</u> challenges (<u>i.e.</u>, those based on the alleged denial of pain-reducing medications and/or on any fact that might be asserted in the amended complaint), *must be exhausted administratively with the **BOP***. "[E]xhaustion is mandatory under the PLRA and . . . unexhausted claims cannot be brought in court." <u>Jones v. Bock</u>, 549 U.S. 199, 211 (2007); <u>see also</u> <u>Woodford v. Ngo</u>,

548 U.S. 81, 85 (2006) ("Exhaustion is no longer left to the discretion of the district court, but is mandatory"); <u>Booth v. Churner</u>, 532 U.S. 731, 734 (2001) (prisoners must exhaust available administrative remedies, even where the relief sought cannot be granted in the administrative process). The exhaustion requirement of the PLRA applies to <u>Bivens</u> claims brought by federal inmates. <u>See</u> <u>Nyhuis v. Reno</u>, 204 F. 3d 65, 69 (3d Cir. 2000). District courts are authorized to <u>sua</u> <u>sponte</u> dismiss inmate complaints pursuant to 42 U.S.C. § 1997e(a) when the failure to exhaust administrative remedies is apparent from the face of the complaint.[8] "[T]o properly exhaust administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules, rules that are defined not by the PLRA, but by the prison grievance process itself." <u>Jones</u>, 549 U.S. at 218 (citation and internal quotation marks omitted).

Here, Plaintiff's submissions indicate that Plaintiff abandoned his BOP administrative proceedings after filing a grievance with his current warden. Therefore, regardless of presence or lack of merits of Plaintiff's claims that are based on the alleged denial of pain-reducing medications (or other claims

---

[8]   Exhaustion conducted for the purposes of <u>Bivens</u> cannot qualify as – or be used in substitute of – exhaustion for the purposes of the FTCA, and vice-versa. <u>See</u>, <u>e.g.</u>, <u>Robinson-Bey v. Feketee</u>, 219 Fed. App'x 738 (10th Cir. 2007).

that might be articulated in Plaintiff's amended complaint), Plaintiff's <u>Bivens</u> challenges appear to be subject to dismissal, without prejudice, as unexhausted.

However, just as with the substance of Plaintiff's factual assertions made in the Complaint, the Court cannot rule out the possibility that Plaintiff's 62-page compilation of exhibits and his discussion of administrative exhaustion of his tort claims before the DOJ inadvertently omitted to mention (or to include exhibits indicating) that Plaintiff also administratively exhausted his constitutional challenges before the BOP.  Therefore, jointly with granting Plaintiff leave to amend his pleading by articulating facts other than those already discussed in this Opinion, the Court will allow Plaintiff an opportunity to clarify whether this Court is correct in its impression that Plaintiff's sole inclusion of the response he received from his warden and Plaintiff's reference solely to the administrative exhaustion of his tort claims before the DOJ should, in fact, be read as indicative of Plaintiff's failure to exhaust his <u>Bivens</u> challenges before the BOP.[9]

IV.  <u>**FTCA CHALLENGES**</u>

    A.  **The Scope and Nature of FTCA Inquiry**

---

[9] In the event Plaintiff's constitutional challenges were duly exhausted, Plaintiff need not copy these administrative papers; it will be sufficient for Plaintiff to merely clarify that he did so exhaust his <u>Bivens</u> claims based on the alleged denial of pain-reducing medication by Elias (or that he so exhausted those <u>Bivens</u> claims with regard to which Plaintiff will elect to articulate additional facts in his amended complaint).

Bivens actions are "premised on the theory that victims of a constitutional violation by a federal agent have an implied right of action to recover damages against the official absent any statute conferring such a right." Muhammad v. Carlson, 739 F.2d 122, 124 (3d Cir. 1984) (citation omitted). The FTCA, in contrast, provides a remedy for a "negligent or wrongful act or omission" by an officer or employee of the federal government acting within the scope of his/her employment.[10] See 28 U.S.C. § 2672. Thus, broadly speaking, the FTCA provides a waiver of the sovereign immunity of the United States for negligence actions, but not for certain intentional torts, which, if they violated a constitutional right, would often be actionable instead by a Bivens-type suit. Therefore, Federal Tort Claims Act and Bivens claims are not mutually exclusive, see Carlson v. Green, 446 U.S. 14 (1980),[11] and

---

[10] Certain specific kinds of tort claims, however, are expressly excluded from the FTCA. See, e.g., 28 U.S.C. § 2680.

[11] The Carlson v. Green Court indicated that two conditions might "defeat" a Bivens cause of action in a particular case: "when defendants demonstrate 'special factors counselling hesitation in the absence of affirmative action by Congress' . . . [or] when defendants show that Congress has provided an alternative remedy which it explicitly declared to be a substitute for recovery directly under the Constitution and viewed as equally effective." 100 S. Ct. at 1471 (quoting and citing Bivens and citing Davis v. Passman, 442 U.S. 228 (1979)) (emphasis removed). Neither consideration is conclusive here. Congress has not expressly indicated that constitutional tort claims are to be brought only under the FTCA; nor has there been an absence of "affirmative action by Congress" in the areas of such tort claims against the government, as evidenced by the FTCA itself and its comprehension of some Bivens-type claims. See 28 U.S.C. § 2680(h).

are often raised, as alternative legal theories, in a single action, as it is the case here. See Fed. R. Civ. P. 8(d) (allowing alternative causes of action).

However, suing the government under the FTCA is qualitatively different from suing a private person for tort. While, indeed, one of the key objectives of the FTCA was to put the United States substantially in the same position as a private person with regard to liability for tort, and the FTCA itself expressly states that the United States shall be liable "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, neither the remedy nor the extent of the government's liability is always coextensive with that which a claimant would have against a private person. As Justice Powell aptly remarked:

> The Federal Tort Claims Act is not a federal remedial scheme at all, but a waiver of sovereign immunity that permits an injured claimant to recover damages against the United States where a private person "would be liable to the claimant in accordance with the law of the place where the act or omission occurred." The FTCA gives the plaintiff even less than he would receive under state law in many cases, because the statute is hedged with protections for the United States.

Carlson, 446 U.S. at 28 (Powell, J. concurring).

Therefore, the FTCA dictates procedural and substantive differences between a suit against a private party and one against the United States; these differences stem from the settled principle that, in consenting to suit against the government,

Congress may impose any conditions it chooses upon the right to sue and upon the nature of the remedy. As the Ninth Circuit observed, "the concept of make-whole relief inherent in much of the common-law tradition does not apply in the context of actions brought against the United States"; instead, "a suit against the United States must start from the opposite assumption that no relief is available." United States v. Park Place Assocs., 563 F.3d 907, 935 (9th Cir. 2009).

For instance, "[b]ecause the Federal Tort Claims Act constitutes a waiver of sovereign immunity, the Act's established procedures have been strictly construed," Livera v. First Nat'l State Bank of N.J., 879 F.2d 1186, 1194 (3d Cir.1989), and while Section 2675(a) mandates that an FTCA action "shall not be instituted upon a claim against the United States for money damages . . . unless the claimant shall have first presented the claim to the appropriate Federal agency," its companion Section 2675(b) further specifies that an FTCA action "shall not be instituted for any sum *in excess of the amount of the claim presented to the federal agency* . . . ." Id. § 2675(b) (emphasis supplied). The Third Circuit has recently held that, "[b]ecause the requirements of presentation and a demand for a sum certain are among the terms defining the United States's consent to be sued, they are jurisdictional." White-Squire v. U.S. Postal Serv., 592 F.3d 453,

457 (3d Cir. 2010).[12]

Moreover, an action may be brought under the FTCA only if the alleged tortfeasor is an employee of the United States; suits against independent contractors are not viable. See Norman v. United States, 111 F.3d 356, 357 (3d Cir. 1997). The alleged tortfeasor is deemed an employee of the United States, and not a

---

[12] In White-Squire, plaintiff had sought damages after her car was struck by a United States Postal Service ("USPS") vehicle. Her attorney sent the USPS notice of a personal injury claim, but did not include a sum certain for damages. After being advised of the sum certain requirement by the USPS, plaintiff's attorney informed them that he would be submitting the sum certain claim once plaintiff was discharged from medical care, but it was never submitted. After plaintiff's complaint was brought, the district court dismissed the action for lack of subject-matter jurisdiction because plaintiff failed to provide the USPS with a sum certain request for damages. On appeal, plaintiff claimed that she was not required to submit a sum certain request because her medical treatment was ongoing. In affirming the district court, the Third Circuit chose not to allow for an exception to the sum certain requirement based on plaintiff's ongoing medical treatment, finding that such an exception "would constitute a judicial expansion of the waiver of sovereign immunity embodied in the FTCA, something which only Congress can effectuate." White-Squire, 592 F. 3d at 458 (internal citation omitted). As a result, the Third Circuit held, "a claimant's failure to present her FTCA claim to the appropriate agency with a sum certain, as required by § 2675(b), compels the conclusion that a district court lacks subject matter jurisdiction over the claim." Id.; see also Bialowas v. U.S., 443 F.2d 1047, 1049 (3d Cir. 1971) (where plaintiff's filled a standard administrative claim form and: (a) in the property damage box, wrote the word 'estimates' followed by two numerical figures; (b) in the personal injury box, wrote "neck, chest, and right arm," and in the box for the total dollar claim, wrote "price of x-rays $35.00," and attached two automobile estimates and his x-ray bill, the Third Circuit affirmed dismissal of the FTCA complaint because "[n]o specific sum was set forth in the claim, nor was there any information supplied from which a specific amount could be computed").

contractor, only if the government has the power to control the detailed physical performance of the actor. See id. For this reason, physicians treating inmates are generally considered independent contractors. See, e.g., Duque v. United States, 216 Fed. App'x 830, 832 (3d Cir. 2007) (since plaintiff produced no evidence that the actual actions of the medical contractors who treated him at a federal penitentiary were controlled and supervised by the government, the United States could not be held liable for any injuries caused by their alleged negligence); see also Moreno v. United States, 387 Fed. App'x 159, 161 (3d Cir. 2010) (same); Lopez-Heredia v. Univ. of Tex. Med. Branch Hosp., 240 Fed. App'x 646 (5th Cir. 2007) (the government could not be liable for the actions of a doctor who allegedly tore a federal inmate's stitches while examining his eye, since the negligence of the doctor was a superseding cause of the injury that destroyed any causal connection between the government's negligence and the injury); Knudsen v. United States, 254 F.3d 747, 750-51 (8th Cir. 2001) (a psychologist who treated plaintiff for post-traumatic stress disorder in a Veterans' Administration hospital was held to be an independent contractor, rather than a government employee); Carrillo v. United States, 5 F.3d 1302, 1304 (9th Cir. 1993) (a physician employed by an organization that had contracted to supply services at an Army Medical Center was an independent contractor rather than a government employee, and the United States was not

liable for his negligence under the FTCA).

Finally, while the <u>respondeat superior</u> relationship is normally no impediment to suit where private parties are involved (<u>i.e.</u>, the injured person can sue either the supervisor or the subordinate or both), the FTCA sharply limits a claimant's remedy against a government employee: there, the entity liable under the <u>respondeat superior</u> theory is the government itself, <u>see McSwain v. United States</u>, 422 F.2d 1086 (3d Cir. 1970) (under the FTCA, the United States is liable for injury caused by the negligent act of a government employee to the same extent a private employer would be liable; such liability for the acts or omissions of a federal employee is determined by the law of <u>respondeat superior</u> of the state in which the act or omission occurred), and in order to assert liability by a person holding supervisory capacity over the alleged wrongdoer, the plaintiff must assert an actual negligent conduct by that supervisor, plus show that the supervisor's own negligence caused or contributed to the plaintiff's injury.  In contrast, bare assertions of mere <u>respondeat superior</u> theory are insufficient to support FTCA claims against persons holding supervisory positions.  <u>See</u>, <u>e.g.</u>, <u>Harris v. Boreham</u>, 233 F.2d 110(1956) (for the purposes of an FTCA claim, the defendant named in his supervisory capacity had no liability because he did not act in a negligent manner and the <u>respondeat superior</u> theory imposed liability on the government, not on him individually).

**B.   Plaintiff's FTCA Claims, As Drafted, Warrant Dismissal**

Having reviewed the relevant principles of the FTCA, the Court now turns to Plaintiff's challenges against his current warden, prior warden, Lopez, Elias and Bourton.

It is evident that Plaintiff's FTCA challenges against his current and prior wardens, being based on mere respondeat superior theory, are simply misplaced: the entity having supervisory capacity for the purposes of Plaintiff's FTCA claims is the United States, not Plaintiff's wardens individually.  Since the Complaint indicates, in no ambiguous terms, that these wardens did not commit any act or omission which Plaintiff qualifies as negligent, these challenges are subject to dismissal with prejudice.

The same, seemingly, applies to Plaintiff's FTCA challenges against Lopez, since Plaintiff mainly alleges Lopez's liability on the basis of her supervisory authority over Elias.  However, since Plaintiff also asserts that Lopez seconded Elias' decision to schedule Plaintiff's examination by an orthopedic surgeon in two weeks, rather than immediately after Elias' examination of Plaintiff, this Court finds it an unwarranted overreaching to find, as a matter of law, that Lopez's approval of such two-week wait could not possibly qualify as an act of negligence.  Therefore, only those Plaintiff's FTCA claims against Lopez that turn on bare respondeat superior theory will be dismissed with prejudice.

Plaintiff's claims against Bourton based on Plaintiff's

disappointment with the fact that Bourton spent ten minutes, rather than a longer period of time, examining Plaintiff's arm, will too be dismissed with prejudice, since a ten-minute first-visit examination cannot qualify as a negligent one in comparison with that conducted by a reasonable physician: the quality of medical exam does not turn on the exact amount of minutes spent, unless the period is so short that no reasonable physician could assess the particular medical problem at issue. See, e.g., Verdicchio v. Ricca, 179 N.J. 1 (2004) (finding potential negligence where the doctor failed to conduct even a five-minute examination of a patient's leg for swelling, redness, heat or other abnormalities of that area, and quoting the expert who pointed out that, although such five-minute examination might appear "long," it would allow a reasonably diligent examining physician to determine that the pain in the left leg, which the patient experiences, could have been a sign of cancer which, being left unnoticed, eventually caused the patient's death). Here, Plaintiff asserts that Bourton spent not a few seconds, or a minute or two, or five minutes examining him, but than Bourton spent ten minutes examining Plaintiff's arm. While the *quality* of that examination might have been so poor as to allow for plausibility of a negligence claim, the sheer *time* aspect of that examination cannot, as a matter of law, qualify as a negligent first visit, especially since Plaintiff unambiguously stated that all generic aspects of his injury were no mystery: the

Complaint asserts that Plaintiff's arm was visibly swollen, indicating that it was either badly bruised or otherwise injured, and Bourton was, apparently, informed that the injury had just occurred as a result of Plaintiff's playing softball.

The foregoing analysis leaves the Court with the following FTCA claims: (1) challenges against Lopez and Elias based on the allegedly negligently delayed scheduling of Plaintiff's examination by a specialist in two weeks from Plaintiff's first visit with Elias; (2) claims against Elias based on his allegedly negligently administration of a cast on Plaintiff's arm and, potentially, on Elias' decision to deny Plaintiff's pain-reducing medication, that is, if Elias did it out of negligence rather than as a result of intentional choice; and (3) claim against Bourton based on his decision not to conduct an x-ray immediately on July 12, 2009, but rather to direct Plaintiff to return next day if Plaintiff's conditions did not improve.

However, with regard to these three lines of claims, Plaintiff did not assert any facts showing that the government controlled the above-detailed physical activities or medical judgments of Lopez, Bourton and Elias, i.e., that they were government employees within the meaning of the FTCA, rather than independent contractors retained to administer medical services to federal inmates in Fort Dix.

Analogously, while asserting that he duly exhausted his tort

claims before the DOJ, Plaintiff neither verifies to the Court that his administrative proceedings were based on the same factual predicate nor does he inform the Court of the exact sum certain, which he sought during that administrative process. Moreover, Plaintiff's instant Complaint does not specify *any* sum that Plaintiff is seeking, pursuant to the FTCA, hence preventing the Court from determining whether Plaintiff is seeking an amount not exceeding the particular sum certain sought before the DOJ.

Therefore, even the three above-discussed potentially plausible lines of claims appear jurisdictionally defective and, as such, warrant dismissal. However, same as with Plaintiff's <u>Bivens</u> challenges, the Court cannot rule out the possibility that Plaintiff may amend his Complaint by asserting: (a) sufficient facts showing that Lopez, Elias and Bourton were government employees within the meaning of the FTCA requirement; (b) Plaintiff's exhaustion of his tort claims before the DOJ that raised the same factual predicate and sought a particular sum certain; and (a) a specific sum Plaintiff is seeking, under the FTCA, in this action.

The Court, therefore, will dismiss Plaintiff's <u>Bivens</u> and FTCA claims that might be cured by repleading without prejudice.

## V.   <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's Complaint will be dismissed. Plaintiff's claims not amenable to cure by amendment

will be dismissed with prejudice, while the remaining claims will
be dismissed with leave to amend.

    An appropriate Order accompanies this Opinion.


                        s/Renée Marie Bumb
                        **RENÉE MARIE BUMB,**
                        **United States District Judge**



Dated: July 12, 2011