**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

_____
                                :
RAFAEL FONTANEZ,                :
                                :    Civil Action No.
            Plaintiff,          :    11-2573 (RMB)
                                :
      v.                        :
                                :
ABIGAIL LOPEZ et al.,           :    **MEMORANDUM OPINION**
                                :
            Defendants.         :
_____:

   This matter comes before the Court upon Rafael Fontanez's ("Plaintiff") filing of his amended complaint, see Docket Entry No. 9. Plaintiff's original complaint was received on May 5, 2011. See Docket Entry No. 1. The original complaint arrived accompanied by Plaintiff's duly executed in forma pauperis application. See Docket Entry No. 1-1.

   On July 12, 2011, this Court issued an order and accompanying opinion which: (a) granted Plaintiff in forma pauperis status for the purposes of the instant matter; and (b) dismissed Plaintiff's claims, with some challenges being dismissed with prejudice and others with leave to amend. See Docket Entries Nos. 2 and 3.

   In response, Plaintiff filed not an amended pleading but a motion raising, mostly, allegations against this Court and, in addition, asserting new challenges, some of which were in contradiction with those stated in the original complaint. See

Docket Entry No. 4. The Court denied Plaintiff's motion and, out of abundance of caution, allowed Plaintiff additional time to file his amended pleading. See Docket Entry No. 6.

The instant pleading followed. See Docket Entry No. 9. The amended pleading requested this Court to disregard Plaintiff's prior filings for all purposes other than the statute of limitations, and to address Plaintiff's substantive challenges raised in the instant pleading entirely anew. See id. The facts asserted by Plaintiff in his amended pleading are as follows:

A.  July 12, 2009:

1.  Plaintiff, playing a game of softball, is hit by a ball thrown by one of the inmates. The ball hits Plaintiff's right arm, causes pain and an instantaneous swelling ensues. Plaintiff becomes unable to move his lower right arm or his right hand.

2.  A few minutes later, Plaintiff is taken to the prison medical department and seen by Defendant Burton ("Burton"), a nurse. Burton visually examines Plaintiff's arm from a few feet away and concludes that the swelling must be a normal effect of the injury. Burton informs Plaintiff that the swelling would continue increasing for awhile, spreading through the arm and hand. Burton directs Plaintiff to apply ice on the injured area for at least two days, gives Plaintiff a large amount of pain killers and issues him a three-day release from work

duties. When Plaintiff inquires whether an x–ray should be taken, Burton concludes that no such measure is needed. Burton closes that visit by directing Plaintiff to return to the medical department if the pain and inability to move the arm persist for more than three days.

B.   July 15, 2009:

1. Plaintiff's condition has worsened in the sense that the swelling and pain have increased, and Plaintiff cannot raise his right arm entirely.

2. Plaintiff comes to the medical department and learns that, since it is a Wednesday, no medical appointments are conducted. Plaintiff, however, approaches Defendant Elias ("Elias"), a doctor. Elias informs Plaintiff that no medical appointments are made on that day and directs Plaintiff to return the next day. Plaintiff, however, insists on Elias taking a look at Plaintiff's arm. Accordingly, Elias takes a look and tells Plaintiff that an x-ray should have been conducted on the day of the injury. Making an emergency exception to the no-appointments-on-Wednesday rule, Elias directs an immediate x-ray of Plaintiff's right arm and determines that Plaintiff's bone was fractured. Correspondingly, Elias places a cast on Plaintiff's right arm and informs Plaintiff that the cast has to be worn for 4 to 6 week and that Plaintiff should be examined by an orthopedic

   specialist.

C. July 30, 2009:

   The swelling of Plaintiff's arm has reduced, and the cast has become loose. Plaintiff keeps checking the list of appointments with an orthopedic specialist, expecting to be called for such appointment the latest by August 6, 2009, because Elias mentioned that date as the later option of the date of possible appointment.

D. August 6, 2009:

   Plaintiff, not being placed on the list of inmates to be seen by an orthopedic specialist, shows up at the medical department and learns that the next round of orthopedic specialist appointments would take place by the end of August 2009. Plaintiff approaches Elias complaining about the delay and the cast becoming loose on his arm; Elias places Plaintiff for August 11, 2009, x-ray in order to determine whether the fractured bone healed and if a continued wearing of the cast is needed.

E. August 9, 2011:

   Another x-ray is taken; it reveals that the healing is in progress but the bone has not fully healed. Plaintiff is directed to continue wearing the cast, as it was originally applied, for two more weeks. Elias informs Plaintiff that he will be seen by an orthopedic specialist on August 27, 2009.

F.  August 19, 2011:

   Plaintiff, who has begun noticing a rash around the area covered by cast and feels itching, removes the cast and observes an even more noticeable rush in the area covered by the cast and, in addition, a large lump in the area of the fraction.

G.  August 20, 2009:

   Elias examined Plaintiff and explains to him that the deformity of tissue is a natural part of the healing process and prescribes Plaintiff anti-rush cream.  Plaintiff requests an additional examination, expressing concern that the bone got misaligned at the fracture point.  Another x-ray is taken, and a misalignment is detected.  Elias places a detachable cast on Plaintiff's arm to be worn until Plaintiff is seen by an orthopedic specialist and informs Plaintiff that the orthopedic specialist would have to operate Plaintiff's arm in order to realign the misaligned bone.  In response to Plaintiff's inquiry as to whether the misalignment could have been avoided, Elias responds by stating that he, _i.e._, Elias, committed an error in medical judgment and points out that, in Elias' prior experiences, placement of a cast, as the one that has been worn by Plaintiff, usually prevented misalignment.

H.  August 21, 2009:

   Plaintiff places a request for his medical records.  Examining

those records, Plaintiff learns that his examination by an orthopedic specialist was pending approval until Elias could conduct more clinical tests and detect information warranting such examination.

I. August 27, 2009:

Plaintiff is examined by an orthopedic specialist. The orthopedic specialist concludes that a surgery is needed to correct the misalignment. The orthopedic specialist's conclusions are made harder to reach due to temporary misplacement of some of Plaintiff's prior medical records.

J. September 18, 2009:

Plaintiff has begun noticing a "mild scraping sound from his right elbow every time the elbow would bend." Plaintiff, therefore, is seen by Elias who directs Plaintiff to bend the elbow slowly and to inform the orthopedic specialist about that "scraping sound" development.

K. October 15, 2009:

Plaintiff's arm is taken to a hospital and gets operated; his arm is placed in a splint.

L. October 16, 2009:

Plaintiff is returned to the prison; Elias instructs Plaintiff to return on October 19, 2009, to have the sutures examined.

M. October 29, 2009:

Plaintiff is examined by the orthopedic specialist and

    complains about the pain in his wrist. The orthopedic specialist opines that the pain might be a result of a cartilage damage and informs Plaintiff that another x-ray would be taken in a month. He directs Plaintiff to continue wearing the splint and recommends physical therapy exercises.

N.   November 19, 2009:

    Plaintiff has an analogous examination by another orthopedic specialist.

O.   December 8, 2009:

    Plaintiff is examined by Elias. Plaintiff states his concern that a certain protruding point on the arm might be indicative of a connecting screw that went through the entire bone and created a basis for bone tissue to develop around that screw. Elias schedules an x-ray to address Plaintiff's concerns.

P.   December 29, 2009:

    Another x-ray is taken and reveals certain complications in the healing of Plaintiff's bone.

Q.   January 26, 2010:

    Plaintiff is examined by a physician's assistant whose medical conclusions and style of interactions Plaintiff finds unpleasant. Plaintiff, therefore, seeks and obtains an examination from Defendant Lopez ("Lopez"), a clinical director. Lopez scheduled Plaintiff for another x-ray and examination by an orthopedic specialist. Lopez explains to

Plaintiff that his examination by an orthopedic specialist was approved after Elias provided Lopez with clinical data of Plaintiff's injury showing that such examination was needed.

R.  January 28, 2010:

Plaintiff is examined by an orthopedic specialist, who informs Plaintiff that the injury has fully healed but a certain range of movements might be proven to be lost. The orthopedic specialist prescribes physical therapy.

S.  February 9, 2010:

Plaintiff, who suffers pain practicing the physical therapy and still continues having certain movement limitations, seeks medical attention. He is scheduled for a medical appointment.

T.  February 17, 2010:

Plaintiff is seen by a doctor who opines that Plaintiff's full recovery might be achieved in only five to ten years. The doctor recommends that Plaintiff not to lift any weight in excess of 20 pounds.

U.  July 29, 2010:

Plaintiff is examined by an orthopedic specialist who prescribes continued physical therapy and directs re-examination in order to determine when the fixation plate and screws holding it could be removed.

V.  November 18, 2010:

Plaintiff is reexamined by the orthopedic specialist who

      recommends removal of the fixation plate and screws while opines that certain pains and limitations in movement might continue after said removal.

W.   June 22, 2011:

      Plaintiff undergoes a surgery in order to remove the fixation plate and screws.

X.   September 9, 2011:

      Plaintiff is seen by a doctor. Plaintiff complains to the doctor that, due to his injury, he is unable to conduct his usual exercise routine; Plaintiff states that he lost 17 pounds over the two years and two months since the injury. Plaintiff speculates that al these 17 pounds might consist of only muscle tissue. The doctor prescribes Plaintiff a nutrition supplement and schedules an x-ray.

Y.   September 22, 2011, and October 13, 2011:

      Surgical staples are removed. Additional x-rays are taken. Plaintiff continues complaining of pain and limited range of movement. Therefore, an MRI is directed.

Z.   November 22, 2011, and December 1, 2011:

      An MRI is taken, it reveals arthritis in the area affected by the injury.

Docket Entry No. 9, at 9-29.

    Naming Burton, Elias, Lopez and Dr. Sulayman ("Sulayman") as defendants in this action, Plaintiff's amended complaint asserts

claims under Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971), and under the Federal Tort Claims Act ("FTCA"). See Docket Entry No. 9, at 4-6. Plaintiff maintains that he filed his first FTCA claim on September 27, 2009, seeking $100,000 in damages, and his second FTCA claim on March 1, 2010, seeking $10,000,000 in damages. Plaintiff asserts that he did not receive any response to his filings. See id. at 7. He now seeks $3,500,000 in compensatory and punitive damages.

Because this Court already extensively detailed to Plaintiff the pleading requirement and governing substantive tests, see Fontanez v. Lopez, 2011 U.S. Dist. LEXIS 74856 (D.N.J. July 12, 2011), another detailed recital of the same is unnecessary. Therefore, the Court will focus its attention only on those points that are controlling for the purposes of the sua sponte review at hand.

A.   Bivens challenges:

As this Court already explained to Plaintiff, claims based on pure respondeat superior theory are not cognizable for the purposes of Bivens challenges against individual defendants. See id. at *14-15. Here, Plaintiff's amended complaint asserts that Sulayman is liable to Plaintiff because "[h]is duties and responsibilities encompass clinical oversight for primary care providers, consultation with those providers, training and m[o]ntoring of those providers," Docket Entry No. 9, at 5, and Plaintiff's amended

pleading mentions Sulayman only twice (that is, in terms of factual allegations): (a) when Sulayman directed that Plaintiff, although not being placed on the list of the inmates to be seen by an orthopedic specialist, would still be seen by such specialist on August 27, 2009, see id. at 17; and (b) that Sulayman was technically designated, in Plaintiff's medical paperwork, as a primary care physician, but no contact, meetings, treatment or any other form of interactions took place between Sulayman and Plaintiff. See id. at 30.  Since the amended complaint makes it abundantly clear that Sulayman had no personal involvement in Plaintiff's situation except for aiding Plaintiff in obtaining an examination by an orthopedic specialist on an emergent basis (which aid cannot qualify as a wrong of any kind), Plaintiff's challenges against Sulayman are subject to dismissal as being based solely on the respondeat superior theory.[1]

Plaintiff's amended complaint also asserts that Defendant Lopez is liable to Plaintiff because Lopez conditioned her authorization for Plaintiff's examination by an orthopedic specialist upon Elias providing her with clinical information showing that Plaintiff needed such examination.  That allegation does not assert deliberate indifference on the part of Lopez, since Plaintiff had no constitutional right in being examined by

---

[1] In fact, Plaintiff's allegations do not suggest even a negligence claim against Sulayman.

a medical professional of his choice. Being now armed with 20/20 hindsight, Plaintiff maintains that the very fact that he eventually was shown to be in need for assistance of an orthopedic specialist must necessarily mean that he was entitled to such assistance right upon his injury. However – until and unless Lopez got clinical information from Elias verifying Plaintiff's need for assistance of an orthopedic specialist – she could not have been deliberately indifferent to what, at that juncture, was merely a hypothetical danger. See, e.g., Dawson v. Frias, 2010 U.S. Dist. LEXIS 30513 at *8 (D.N.J. Mar. 30, 2010) ("speculation as to what might or might not happen in the future" cannot serve as a basis for a valid claim) (citing Rouse v. Pauliilo, 2006 U.S. Dist. LEXIS 17225 (D.N.J. Apr. 5, 2006) (dismissing speculative claim as to hypothetical future development and citing Kirby v. Siegelman, 195 F.3d 1285 (11th Cir. 1999)); Pilkey v. Lappin, 2006 U.S. Dist. LEXIS 44418, at *45 (D.N.J. June 26, 2006) ("Plaintiff's [anxiety paraphrased as his claim of] fail[s] to state a claim upon which relief may be granted"); Patterson v. Lilley, 2003 U.S. Dist. LEXIS 11097 (S.D.N.Y. June 20, 2003) (defendants could only be found liable to violations ensuing from an existing condition, not to a speculative future injury). Therefore, Plaintiff's challenges against Lopez, be they based on a respondeat superior theory or on Plaintiff's assertion that Lopez conditioned Plaintiff's examination by an orthopedic

specialist upon Elias' furnishing her with clinical information indicating need for such examination, are facially without merit and must be dismissed. Indeed, Plaintiff's allegations verify that – once Lopez obtained such clinical information from Elias – Lopez scheduled Plaintiff for an examination by the orthopedic specialist. Correspondingly, Plaintiff's allegations do not suggest even a negligence claim against Lopez.

Plaintiff's allegations against both Burton and Elias state a nearly text-book chain of negligence claims, since Plaintiff asserts nothing but errors in medical judgment and tardiness in preparation of Plaintiff's clinical data. If anything, Plaintiff's amended complaint verifies that Plaintiff was treated on a constant, usually weekly and often daily, basis. There is a difference between: (a) "denial" of medical care; and (b) failure to provide "adequate" care. For the purposes of a claim of constitutional magnitude, the "deliberate indifference" test cannot be met by an accumulation of purely negligence claims. See Estelle, 429 U.S. at 106 (allegations of negligent treatment do not trigger constitutional protections because "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner"); Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004) (allegations of medical malpractice or mere disagreement as to proper medical treatment are insufficient to establish a constitutional violation).

Since Plaintiff already had an opportunity to replead his Bivens challenges, and stated the facts of these claims in great detail, allowing Plaintiff another opportunity to replead his Bivens allegations would be futile. Correspondingly, this Court is constrained to dismiss Plaintiff's Bivens claims with prejudice.

B.  FTCA challenges:

As for his FTCA claims, Plaintiff's amended pleading did not name the United States as a defendant; rather, the amended complaint named Burton, Elias, Lopez and Dr. Sulayman as defendants for the purposes of Plaintiff's FTCA challenges. Since it is apparent from the face of the amended pleading that such designation was made as a result of Plaintiff's good faith confusion as to the workings of the FTCA and the identity of proper FTCA defendant, this Court will direct to the Clerk to add the United States as a defendant in this matter and to terminate Burton, Elias, Lopez and Dr. Sulayman as individual Defendants.

The Court now turns to the substance of Plaintiff's FTCA challenges based on the actions of Burton, Elias, Lopez and Dr. Sulayman, i.e., the persons whom the Court presumes – without making a factual finding to that effect – to be agents of the United States within the meaning of the FTCA law.[2]

---

[2] Analogously, the Court presumes, without making a factual finding to that effect, that Plaintiff's FTCA challenges were duly exhausted in all respects, including the "sum certain"

As detailed <u>supra</u>, Plaintiff's allegations against Lopez and Dr. Sulayman do not assert any tortious conduct, including any acts of negligence. Indeed, the pleading at bar makes it abundantly clear that Dr. Sulayman's "conduct" was limited to his holding of a supervisory position, his being listed as Plaintiff's official physician on Plaintiff's medical paperwork, and his arranging Plaintiff's unscheduled, emergent meeting with an orthopedic specialist. However, the sole "supervisor" that could be liable for the purposes of an FTCA claim, is the United States, and that "supervisor" might be liable solely on the basis of the actual tortious actions undertaken by agents of the United States in their agency capacity. Here, even if Dr. Sulayman was a United States agent, Plaintiff's FTCA claims necessarily fail because Dr. Sulayman committed no tortious conduct against Plaintiff. Thus, this line of Plaintiff's FTCA challenges must be dismissed.

Analogously, FTCA Plaintiff's claims based on Lopez's conduct are facially meritless since, even if she were acting as a United States agent, Lopez's conduct could not be deemed tortious. Her directive to Elias to supply her with Plaintiff's medical information (in order to determine whether Plaintiff's healing was progressing well or an examination by an orthopedic specialist was needed) did not violate her duty of care.

In contrast, Plaintiff's FTCA allegations based on Burton and

---

aspect.

Elias' conduct meet the <u>Iqbal</u> plausibility standard for the purposes of the FTCA. Therefore, the Court will direct service on the United States with regard to these two line claims.

<u>Conclusion</u>

  An appropriate Order accompanies this Memorandum Opinion.

            <u>s/Renée Marie Bumb</u>
            **RENÉE MARIE BUMB**
            **United States District Judge**

<u>Dated:</u> <u>November 20, 2012</u>